Richard Eppink
**AMERICAN CIVIL LIBERTIES UNION**
**OF IDAHO FOUNDATION**
Idaho State Bar no. 7503
reppink@acluidaho.org
P.O. Box 1897
Boise, Idaho  83701
(208) 344-9750, ext. 1202

*Attorney for the Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| **JAX PEREZ,** | Case no. 1:21-cv-00251 |
| **Plaintiff,** | |
| **v.** | **COMPLAINT** |
| **CITY OF BOISE, and KEVIN BOOE, SARAH KELLEY-CHASE, and SARAH MARTIN, in their individual capacities, and JANE/JOHN DOEs 1–6, whose true names are unknown, in their individual capacities,** | **(JURY DEMANDED)** |
| **Defendants.** | |

This is an employment discrimination and freedom of speech case.
Defendants punished Plaintiff Jax Perez for objecting to harassment and abuse, and
for merely identifying as LGBTQ. The City of Boise and its employees forced Jax to
choose between enduring anti-LGBTQ attacks or being fired—all while, ironically,
flying the Pride Flag and disingenuously pledging no tolerance for harassment or
discrimination based on gender or sexual orientation.

COMPLAINT (JURY DEMANDED) – Page 1

## SUMMARY

1. Jax is transgender and does not conform with traditional sex stereotypes. Transgender people suffer bias and prejudice and experience higher risks of discrimination, harassment, and violence. They are particularly at risk for mental health problems due to the stress of marginalization and victimization. (Gender identity is distinct from sexual orientation. A transgender person may be lesbian, gay, bisexual, or heterosexual, but many identify their sexual orientation as queer, pansexual, or some other orientation.)

2. People who are transgender, including people with nonbinary identities like Jax, are a long-standing and integral part of the LGBTQ community.

3. The plaintiff here, Jax Perez, is transgender, nonbinary, and a member of the LGBTQ community. Jax worked for years at the Boise Public Library, a department of the City of Boise. Jax dreamed of building a lifelong career in libraries.

4. The City of Boise ruined those dreams for Jax during Pride Month in 2019, when the world celebrates the LGBTQ community and individuals who are transgender, nonbinary, queer, gay, bisexual, and lesbian.

5. The City and the other defendants punished Jax during Pride Month because of Jax's sex, because Jax is transgender and nonbinary, and because of Jax's protected speech and expression. Because Jax identified as a "member of the LGBTQ community," the Library's Director tried to fire Jax and the City formally disciplined Jax.

COMPLAINT (JURY DEMANDED) – Page 2

6. Defendants' acts unlawfully discriminated against Jax and violated Jax's constitutional rights. The Court should grant Jax relief for these violations.

## PARTIES

7.  Jax Perez is Jaclyn Perez, the Plaintiff. Jax is an adult and resident of Boise, Idaho. Jax uses they/them pronouns, as in: "Jax brings this lawsuit. They are the Plaintiff. Defendants discriminated against them."[1] Jax's gender identity, which is closely related to their spirituality, is nonbinary: they are agender, or without a gender. Jax was an employee of the City of Boise from May 25, 2016 through November 20, 2020. Their job title as a City of Boise employee was "Page" for roughly the first month of their employment, and for the remaining time after that their job title was "Library Assistant."

8. Jax does not conform with sex stereotypes associated with the female sex ascribed to Jax at their birth. Beginning in 2017 and continuously since then, Jax has used gender-neutral pronouns (they/them). From 2018 through to today, Jax asks people, including coworkers and managers at the Boise Public Library, to use those pronouns when referring to Jax. Jax began dressing androgynously, including while at work at the Library, beginning before June 2019, when the harm Jax complains about herein began. Jax also began shaving their head before June 2019, and kept it shaved while employed at the Library.

---

[1] See Jessica A. Clarke, *They, Them, and Theirs*, 132 HARV. L. REV. 894 (2019), for a discussion of nonbinary gender identities, gender-neutral pronouns, and civil rights.

COMPLAINT (JURY DEMANDED) – Page 3

9. Despite Jax's request to coworkers, including managers, at the Library to use gender-neutral pronouns when referring to them, some of those coworkers and managers—including the City's Library Director, Defendant Kevin Booe—would misgender[2] Jax, using she/her pronouns when referring to Jax. As this Court has recognized, misgendering a person can be degrading, mean, inflammatory, and mentally devastating to that person.

10. A photo of Jax from June 2019, Pride Month, when the harm Jax seeks justice for began:



---

[2] To **misgender** a person is "to identify the gender of (a person, such as a transsexual or transgender person) incorrectly (as by using an incorrect label or pronoun)." Misgender, Merriam-Webster, https://www.merriamwebster.com/dictionary/misgender.

COMPLAINT (JURY DEMANDED) – Page 4

11.  The City of Boise (sometimes referred to just as the "City" in this Complaint), a Defendant, is a municipal corporation organized under the State of Idaho. The City of Boise has had well over 1,000 employees throughout the period relevant to this complaint. It is engaged in industries affecting commerce.

12.  Kevin Booe, Sarah Kelley-Chase, and Sarah Martin, also Defendants, were employees of the City of Boise at the time of the acts that Jax complains about here and when the harm that Jax complains about here began. They did or ratified the acts that caused harm to Jax. Booe was the City's Library Director. Kelley-Chase was the Public Services Manager for the City's Library. Martin was an Employee Relations Senior Manager for the City's Human Resources department. They are sued in their individual capacities.

13. Jane/John Does 1–6, whose true names are unknown, are other employees or agents of the City of Boise who did or ratified the acts that caused harm to Jax. Jax will amend this complaint after discovery determines the identities of these Doe defendants. They are sued in their individual capacities.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction under 28 U.S.C. § 1331 over the plaintiff's claims because they arise under federal law, as well as under 28 U.S.C. § 2201.

15. Venue is proper with this Court under 28 U.S.C. § 1391(b), because all of the illegal conduct the plaintiff complains about occurred in Idaho.

## FACTS

16.  Pride Month recognizes people marginalized and discriminated against because of their gender identity or sexual orientation, and the impact that they have had on history locally, nationally, and internationally.

17. The President of the United States first officially proclaimed Pride Month in 1999. Twenty years later, in June 2019, Pride Month was celebrated by millions of people and by governments and employers, big and small, around the world, including in Boise, Idaho.

18. The City of Boise and the Boise Public Library celebrated Pride Month in 2019. The City of Boise, for example, raised and flew the Pride flag at City Hall during June 2019. And the Hillcrest Library branch of the Boise Public Library, where Jax was working, made Pride flag pins available for free to the public that month.

19. The Hillcrest Branch also hosted a teen event scheduled during Pride Month 2019 called "Makeup is Such a Drag." At this event, a drag queen[3] taught skills for applying makeup—drag makeup in particular.

20. Near the beginning of Pride Month 2019, while at work, Jax created a Facebook event for the "Makeup is Such a Drag" event. A Facebook event is a

---

[3] Drag, which dates back centuries, is its own thread in the long world history of LGBTQ resilience. Drag "shakes up all rigid definitions for gender and sexuality, parodying stereotypes of femininity and masculinity." Monica Baroni, "Drag," *in* David A. Gerstner (ed.), *Routledge International Encyclopedia of Queer Culture* 191 (2012).

webpage within Facebook, the social media platform. Facebook users and others can share the event with individuals and groups within Facebook and elsewhere. At the time Jax created this Facebook event, the Library had not adopted a process for employees to follow when sharing Library events over social media.

21. The Hillcrest Branch is located in Boise's Bench neighborhoods. From Jax's personal Facebook account, they shared the "Makeup is Such a Drag" Facebook event with a Facebook group that Jax is a member of called "Boise Bench Dwellers."

22. In sharing the "Makeup is Such a Drag" event with the Boise Bench Dwellers group, Jax did not state and even imply that Jax worked for the Library or the City.

23. After Jax shared the event with the Boise Bench Dwellers group, people posted comments that misgendered and deadnamed[4] transgender people, a mean and intentionally harmful form of abuse that social media platforms have banned, and that courts have recognized as harassment. Jax replied to those comments from their personal Facebook account, intervening to stop the harmful comments. Still from their personal Facebook account, Jax also contacted a group administrator of the Boise Bench Dwellers Facebook group about the discriminatory comments. A Facebook group admin is a user who can remove comments or members from a

---

[4] A **deadname** is the name that a transgender person was given at birth and no longer uses upon transitioning. Deadname, Merriam-Webster, https://www.merriam-webster.com/dictionary/deadname. To refer to someone by their deadname is known as **deadnaming**. *Id.*

COMPLAINT (JURY DEMANDED) – Page 7

Facebook group. Jax asked the Boise Bench Dwellers group admin if the users who had posted the discriminatory comments were breaking the group's rules. The group admin told Jax that the discriminatory comments were indeed against the group's rules. The group admin removed the users who posted those comments from the Boise Bench Dwellers group.

24. The City has acknowledged that its Social Media Administration Regulation would normally not apply to Jax's comments because Jax posted the comments from their personal account.

25. Despite that Jax neither stated nor implied that they had shared the "Makeup is Such a Drag" event with the Boise Bench Dwellers group as a Library employee, Jax's direct supervisor sent Jax a memo on June 17, 2019, instructing Jax to use their "best judgement in making sure that there is nothing that solicits advice, gives a message against our mission statement, or could be misconstrued as inappropriate" when working on a library related event or topic.

26. The City's own employment policies make clear that the City is committed to providing equal opportunity for all persons without regard to gender, sexual orientation, or gender identity, and that this equal opportunity extends to "all aspects" of employment.

27. The City's employment policies make equally clear that the City does not tolerate sexual or gender harassment, including harassment based on a person's gender or sexual orientation. The City considers such harassment to be a "serious offense."

COMPLAINT (JURY DEMANDED) – Page 8

28. The City's policies assure employees that they may stop or prevent such harassment by "immediately and directly expressing their disapproval to the individual" who is harassing them.

29. Two days after the June 17, 2019 memo—still during Pride Month—a library patron confronted Jax while they were working at the front desk at the Hillcrest Branch. It was the evening of June 19, 2019. The patron came up to Jax and tossed Pride flag pins onto the Library's front desk.

30. The pins were the ones that the Library made available during Pride Month to patrons. They looked like this:



31. After tossing these pins onto the Library's desk in front of Jax, the patron called the Pride buttons a "vice," to Jax's face. He asked Jax whether Jax would make "marijuana pins" available to children as well; Jax told him, "No."

32. Jax, who the patron had just insulted and dehumanized, remained calm. Jax responded to the patron by saying: "I'm sorry that you feel that way. As a member of the LGBTQ community myself I am sorry that you feel that way."

33. The next morning, June 20, 2019, Jax reported the harassment in an email to their supervisor. In the email, Jax reported that the harassment left them "extremely shaken up and scared." They shared that they "haven't had to deal with homophobia in real life to my face in quite a while," and reiterated that "as a queer individual myself, I was scared."

34. Jax's supervisor forwarded the email report to Defendant Kelley-Chase, who forwarded it to Defendant Booe. Rather than address the harassment Jax experienced, Defendants Booe and Kelley-Chase began almost immediately to take actions to fire Jax.

35. The same day, June 20, 2019, Library Director Defendant Booe emailed Defendant Kelley-Chase and Jax's direct supervisor, directing them to have an "exit strategy" for Jax by 9:00 am the next day. Booe repeatedly misgendered Jax in the email, referring to Jax as "she," "her," and "Ms. Perez," and commanded: "I want her out of BPL."

36. In the same email, Defendant Booe suggested the Library's Pride display and Pride flag pins could be a "bre[a]ch of mission and ethics."

COMPLAINT (JURY DEMANDED) – Page 10

37. The Library removed the Pride flag pins from the Hillcrest Branch. According to the Idaho Human Rights Commission, Defendant Booe's communications caused the Library to remove the Pride flag pins.

38. The same patron came back to the Hillcrest Branch that day (after harassing Jax about the Pride flag pins the night before). He sat staring at Jax in a sinister way for 10 to 15 minutes. Jax feared for their safety and retreated to a back room.

39. Jax's supervisor, the Hillcrest Branch Supervisor, spoke with the patron on the phone on June 21, 2019. The patron had complained to her about the Pride flag pins on June 19, 2019, shortly after harassing Jax. When she called the patron, the first thing he asked was: "Are you the one with the shaved head?" He insisted that she watch videos of Pride parades and told her that it was ridiculous that she wouldn't agree that gay sex was bad. He became belligerent and loud, repeatedly insisting that she agree that gay sex was bad.

40. This is a screenshot of a social media post Jax published after the patron harassed them, as they began to learn that Defendants were planning to terminate Jax for objecting to the patron's harassment:



41. On June 21, 2019, Defendant Kelley-Chase sought assistance from Defendant Martin in "transitioning" Jax "out of the organization." Kelley-Chase, like Defendant Booe, misgendered Jax in her email seeking assistance with terminating Jax.

42. In the last week of Pride Month, on June 24, 2019, Jax's direct supervisor handed Jax a "Notice of Intent to Discipline," dated June 21, 2019. The Notice outlined Jax's interactions with the patron who harassed them and referred to Jax's objections to harmful comments on Facebook a week before. A copy of the Notice was put in Jax's personnel file.

COMPLAINT (JURY DEMANDED) – Page 12

43. Jax met with their direct supervisor and a City HR representative the same day, June 24, 2019, that Jax received the Notice. Jax reported how the patron had returned to the Library the day after harassing Jax about the Pride flag pins, to stare sinisterly at Jax, leaving Jax again in fear for their safety. Jax also informed the City's HR representative that the Notice—the City's response to Jax's report of harassment that left Jax feeling "extremely shaken up and scared"—was "directly homophobic" and not in line with City policies supporting the LGBTQ community.

44. On July 3, 2019, Defendant Booe emailed Defendant Kelley-Chase and the rest of the Library management team, including Jax's supervisor, to express that he was "very disappointed" and "very upset" that the Library had only three events planned for the anniversary of the moon landing "and yet so many and controversial for PRIDE." (As the Idaho Human Rights Commission later observed in its decision regarding Jax's case, "[a]stronauts do not have the same history of abuse and violent crimes directed towards them, such as homosexual and transgender individuals.")

45. On about July 16, 2019, Jax's direct supervisor handed Jax a formal "Written Warning." The warning letter punished Jax both for their Facebook post about the "Makeup is Such a Drag" event and for objecting to the harassment from the patron who confronted Jax and called Pride Flag pins a "vice."

46. Defendant Martin wrote the warning letter and Defendant Kelley-Chase reviewed and approved it.

COMPLAINT (JURY DEMANDED) – Page 13

47. The warning letter admonished that Jax's "decision to make known to the patron that you were a member of the LGBTQ community, was inappropriate." The letter warned Jax that they must "refrain from engaging in conduct that is the same or similar," immediately. If Jax failed to abide, the letter said, Jax could be disciplined further, including by termination.

48. Jax's direct supervisor, who delivered the warning letter to Jax, refused to sign the letter, even though it had been prepared for her signature. Instead, Jax's supervisor wrote below the line for her signature that "I do not agree with discipline of warning" in her own handwriting, signing and dating that statement.

49. The warning letter, like the Notice of Intent to Discipline, went into Jax's personnel file.

50. After getting the written warning letter, Jax submitted an internal Equal Employment Opportunity (EEO) complaint with the City on about July 19, 2019. The City issued an "Investigation Conclusions & Findings" memo, from Defendant Sarah Martin to Jax, dated September 27, 2019, finding no discrimination or EEO violations. Jax then appealed the City's "Investigation Conclusion & Findings" about the EEO complaint. The City affirmed Jax's punishment, including the written warning letter, in a "final decision" dated October 8, 2019.

51. Jax timely filed a charge of discrimination against the City with the Equal Employment Opportunity Commission (EEOC) and Idaho Human Rights Commission, alleging sex discrimination and retaliation.

52. In a memorandum decision dated April 29, 2021, the Idaho Human

COMPLAINT (JURY DEMANDED) – Page 14

Rights Commission found probable cause to believe that sexual harassment occurred, concluding that "Perez has shown with evidence that they were disciplined, at least in part, due to their transgender identity" and therefore "prevails on their charge" related to that discipline.

53. The Idaho Human Rights Act matter remains pending before the Idaho Human Rights Commission for conciliation. In addition to the 42 U.S.C. § 1983 claims brought in this complaint, Jax also has claims against the City under Title VII of the federal Civil Rights Act of 1964 and the Idaho Human Rights Act. Jax will later amend this complaint to include those claims if those claims are not resolved through conciliation before the Idaho Human Rights Commission.

54. Defendants' actions against Jax, as well as Defendants' failure to take action to prevent discrimination and ensure a workplace that does not enforce sex stereotypes, made Jax's workplace feel hostile to them, made Jax feel that they were not safe at work, and caused Jax to feel that those in positions above them at the Library will not protect employees and others in groups historically marginalized and discriminated against.

55. As a result of the stress caused by Defendants' discrimination and retaliation against them, Jax's whole life became consumed by stress. They have felt the effects of Defendants' discrimination and retaliation, and the hostile environment perpetuated by Defendants' failure to act, on a daily basis. They have been in counseling because of the discrimination and retaliation. They have also experienced physical pain due to the stress. The impacts of Defendants'

COMPLAINT (JURY DEMANDED) – Page 15

discrimination and retaliation against Jax was ultimately too much for them to bear, and they resigned their employment because of it. Jax's physical, mental, and emotional health and well-being continue to suffer because of the City's discrimination and retaliation against them.

<u>**CLAIMS FOR RELIEF**</u>

**1. 42 U.S.C. § 1983 (Equal Protection)**
**including both individual and *Monell* liability**
**(against all Defendants)**

56. Defendants took adverse action against Jax because of Jax's sex and transgender status.

57. Defendants intentionally and selectively took adverse action against Jax because of Jax's sex and transgender status.

58. Defendants' actions against Jax, including their 6/17/2019 memo and 7/16/2019 written warning, violated the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

59. Defendants' actions against Jax singled out Jax, because of their departure from sex stereotypes, for discriminatory treatment.

60. Defendants' actions against Jax were not substantially related to any important government interest.

61. Defendants' actions against Jax were not rationally related to any legitimate state interest.

62. At the time of these events, the defendants were all state actors acting under the color of state law, and they acted and purported to act in the performance

COMPLAINT (JURY DEMANDED) – Page 16

of official duties.

63. Defendants deprived Jax of their rights to equal protection under the Fourteenth Amendment to the United States Constitution.

64. Defendants acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant City of Boise of discriminating against and punishing employees who identify or out themselves as LGBTQ.

65. Defendants Booe, Kelley-Chase, Martin, and the Doe defendants had final policymaking authority concerning the acts that violated Jax's Equal Protection rights.

66. Defendants ratified those acts, and they knew of and specifically made a deliberate choice to approve the acts and the basis for them.

67. The City's training policies were not adequate to prevent violations of law by its employees or train its employees to handle the usual and recurring situations with which they must deal. The City was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees and to the known or obvious consequences of its failure to train its employees adequately. The City's failure to train and to prevent violations of law by its employees is so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused Jax's ultimate injuries.

68. Jax has suffered harm and damages, including emotional distress and psychological damage, as a direct and proximate result of Defendants' acts and deliberate indifference to their rights.

COMPLAINT (JURY DEMANDED) – Page 17

69. Jax seeks all available damages including punitive damages against Defendants Booe, Kelley-Chase, and Martin in their individual capacities, as Defendants' actions were taken in reckless disregard for Plaintiff's civil rights.

## 2. 42 U.S.C. § 1983 (Freedom of Speech and Expression, Overbreadth, and Vagueness) including both individual and *Monell* liability (against all Defendants)

70. Defendants' actions against Jax, including their 6/17/2019 memo and 7/16/2019 written warning, impermissibly restricted Jax's freedom of expression, including based on its content and viewpoint, and constituted an impermissible prior restraint.

71. Defendants action against Jax, including their 6/17/2019 memo and 7/16/2019 written warning, impermissibly retaliated against Jax for protected speech and expression.

72. Jax's speech objecting to anti-LGBTQ harassment and identifying themself to a library patron as a member of the LGBTQ community was protected speech.

73. Jax's speech and expression on Facebook in response to misgendering, deadnaming, and harassing comments were protected speech and expression.

74. Defendant's actions against Jax, including their 6/17/2019 memo and 7/16/2019 written warning, impermissibly retaliated against Jax in violation of Jax's rights to free expression under the First and Fourteenth amendments to the United States Constitution.

COMPLAINT (JURY DEMANDED) – Page 18

75. Defendants' actions against Jax, including their 6/17/2019 memo and 7/16/2019 written warning, were also impermissibly vague. They failed to apprise a person of ordinary intelligence of the kinds of expression that might be deemed to subject Jax to additional discipline or termination, and were so standardless that they authorized and encouraged seriously discriminatory enforcement.

76. Defendants' actions against Jax, including their 6/17/2019 memo and 7/16/2019 written warning, were also impermissibly overbroad. They prohibit a substantial range of expression that Defendants have no conceivable justification or right to suppress.

77. At the time of these events, Defendants were all state actors acting under the color of state law, and they acted and purported to act in the performance of official duties.

78. Defendants deprived Jax of their rights to freedom of expression under the First and Fourteenth amendments to the United States Constitution.

79. Defendants acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant City of Boise of discriminating against and punishing employees who identify or out themselves as LGBTQ.

80. Defendants Booe, Kelley-Chase, Martin, and the Doe defendants had final policymaking authority concerning the acts that violated Jax's freedom of speech rights.

81. Defendants ratified those acts, and they knew of and specifically made a deliberate choice to approve the acts and the basis for them.

COMPLAINT (JURY DEMANDED) – Page 19

82. The City's training policies were not adequate to prevent violations of law by its employees or train its employees to handle the usual and recurring situations with which they must deal. The City was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees and to the known or obvious consequences of its failure to train its employees adequately. The City's failure to train and to prevent violations of law by its employees is so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused Jax's ultimate injuries.

83. Jax has suffered and will continue to suffer harm and damages, including emotional distress and psychological damage, as a direct and proximate result of Defendants' acts and deliberate indifference to their rights.

84. Jax seeks all available damages including punitive damages against Defendants Booe, Kelley-Chase, and Martin in their individual capacities, as Defendants' actions were taken in reckless disregard for Plaintiff's civil rights.

## **PRAYER FOR RELIEF**

Plaintiff requests that the Court enter judgment in their favor, against Defendants, and award the following relief:

1. Monetary damages to fairly and reasonably compensate Plaintiff for the deprivation of their rights, including compensatory (emotional distress) and consequential damages, as well as punitive damages against Defendants Booe, Kelley-Chase, and Martin;

COMPLAINT (JURY DEMANDED) – Page 20

2. A declaration that defendants violated Plaintiffs' constitutional rights under Title VII, the Idaho Human Rights Act, and the United States Constitution.

3. Any other appropriate declaratory or injunctive relief;

4. Pre-judgment and post-judgment interest at the highest lawful rate;

5. Attorneys' fees, costs, and other expenses of this action;

6. Any other relief that justice allows.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues for which one is available.

DATED this 11th day of June, 2021.

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
OF IDAHO FOUNDATION


/s/ Richard Eppink
Richard Eppink
Attorney for the Plaintiff